Thank you, Your Honors. Good morning. May it please the Court, my name is Sam Shapiro and I represent Appellant J.M., the Administrator of Seabees Estate. This Court's 1984 opinion in Society for Goodwill remains good law in this circuit and it controls this case. The District Court erred by concluding that the Supreme Court's opinion in DeShaney renders Society for Goodwill inapplicable here. Like this case, Society for Goodwill involved residents of a state-run mental health facility. This Court held that residents of that facility, regardless of whether they are voluntary or involuntary residents, have a substantive due process right to adequate medical care. The State in Society for Goodwill did not even dispute that the residents had substantive due process rights to adequate medical care. Society for Goodwill was this Court's application of the principles articulated by the Supreme Court in Youngberg v. Romero. In Youngberg, the Supreme Court held that a resident of a state-run mental health facility had substantive due process rights, including the right to adequate medical care. DeShaney did not overrule Youngberg, nor did it overrule this Court's opinion in Society for Goodwill. DeShaney did not involve a state-run mental health facility. DeShaney did not involve a person who was even in state custody. And it involved harm that was inflicted by a private actor, the father of Joshua DeShaney. Under Society for Goodwill and Youngberg, it is CB's dependence on the state that gives rise to a constitutional right to adequate medical care. You will agree, though, that the Supreme Court stressed in its discussion in DeShaney, the exercise of the state's power, an affirmative exercise of power to retain someone in custody and to exercise, you know, to limit their freedom in some ways, the basis for Youngberg. What's your comment? How can we just dismiss that out of hand? Well, the Supreme Court certainly did distinguish Youngberg and Estelle v. Gamble in DeShaney. What the Supreme Court's ultimate conclusion was, was that the analysis in Youngberg and Estelle had no applicability in DeShaney. And that's correct, because as I said, DeShaney did not involve a person in state custody, and it involved harm inflicted by a private actor. The discussion that the Supreme Court has about Youngberg is an effort to distinguish the case, but it does not suggest or state that those are the sole circumstances under which the special relationship could exist. But doesn't it still stress the notion that the state needs to have exercised and has deprived someone of liberty in order to have a substantive due process obligation imposed on it? In that context, in the context in which that case arises, which again involved Joshua DeShaney, who was in the custody of his father. He was never in state custody. And the question was whether the state, the protective services, county protective services, had a duty to protect Joshua from his father. And this Court held that it didn't. And the Court distinguished Youngberg from that circumstance, and it held that the holding in Youngberg and the analysis in Youngberg did not apply in the DeShaney case. The discussion about- All right. Counsel. Counsel, and I apologize. I thank my colleagues for and everyone's indulgence for me appearing by Zoom, but I have just a quick follow-up question. I noticed you said that in DeShaney, the father had custody of the child, not the state. But at one point, the state did have custody of the child, right? Initially, there was a hold, and then the child was returned to the father without the state retaining custody, and didn't, in fact, in DeShaney, the Court note that it would have been a different story had, for example, the child, the state taken custody of the child through, you know, a temporary commitment and placed the child in foster care, or sometimes the state takes custody of the child and puts the child with a different relative. And in that case, the state, certainly the child would have been in custody, and the Court notes that would have been a different situation, correct? That's exactly right, Judge Kahn. And that comes up in footnote 9 in the DeShaney opinion. The Court distinguishes the situation from a case, from a situation where, as you note, the state might place someone in foster care. It says its holding doesn't apply in those circumstances. And here, this is much more akin to a situation where the state has taken custody over CB. The circumstances of CB's confinement – I have a question about that. I know that, and I have more questions for your opponent about the voluntariness or lack thereof of commitment. But a quick question in terms of the factual basis here in this case. I understand that no one disputes that CB's mother voluntarily admitted him to the facility, or at least initially, when he turned 18, he went to a different facility initially. My question is, at the time he entered this current facility on a voluntary basis, who was his custodian? Was mother conservator of the person, or had she given up custody to the state, if you know? Or if the record – not if you know, but if there's anything in the record about that. Understood, Judge. His mother was not his guardian at the time he was admitted to Valley Ridge. He was admitted to Valley Ridge in 2015. He was originally admitted into state custody in 2000 when he turned 18, as you say. That happened around the time he had had some criminal problems as well. The referral to Valley Ridge CIT, which is a secure facility, one of OPWDD's two most secure facilities, it has a fence and barbed wire around it. And the record reflects that his referral was in response to ongoing assaultive behaviors, and that's it. Was there ever a competency hearing about his own competency to consent to remain? He was found to have capacity to consent to certain things. The record does not reflect a hearing having taken place. He did have the capacity, and he does sign – the admission form to Valley Ridge is signed by him himself. I will note there's a section on the form that discusses the reasons for the admission. That is not written by him. That states that he's brought there to manage his aggressiveness. Can you tell us a little bit more about the circumstances of the transfer from the less secure facility to Valley Ridge? How did that come about? What the record reflects, Your Honor, is again, as I said, that it was in response to an ongoing assaultive behavior. That's at Appendix 2255. So presumably the – earlier, the state facility recommended the transfer to the more secure facility? That's certainly what the record suggests, Your Honor. There's another note in his record that says that his treatment – that he has failed to progress to a point in treatment where a referral to a less secure facility might be warranted. And that's at Appendix 2258. And so the record certainly suggests that he was placed there because of these assaultive behaviors. What significance should we give to the fact that neither C.B. nor his mother ever actually requested that he be released from Valley Ridge, for example, to have medical treatment? Well, first of all, they did request that he go to the hospital on the day he died. Both he and his mother requested that, and those requests were ignored. So I would note that. The fact that he didn't, in fact, put in the request to be released, I don't think that has significance here constitutionally, Judge. The state had a right to keep him for three days even in response to a request for release. The admission form, when he got his notice of rights, it says you may request your release. However, the director may keep you here for up to three days in response to such a request. So he didn't have the ability to just walk out the door by any stretch. Yeah. And what rule are you actually proposing that we apply to determine whether substantive due process rights attach or not? I mean, is it we have voluntariness and involuntariness, we have just general custody, and then I think you used the word dependency. But of course, that's a very malleable and, you know, flexible standard, I suppose. And there may be people in Valley Ridge who were dependent, and some people were not so dependent but needed to be restrained for some reason or another. Can you help me understand what you would propose we apply for this purpose? Sure, Judge. Society for goodwill should be reaffirmed and should control this case, Judge. And in Valley Ridge, and in fact, throughout OPWDD, there is, in fact, in reality, no distinction in how involuntary or voluntary patients receive care. So you think we should put Deshaney just in the custody, no custody bucket and not pay attention to some of the language they use about the state's affirmative exercise of power and just look at custody or no custody? I think in this case, when we have someone who is the resident of a secure mental health institution, society for goodwill plainly controls, and it is the same situation that applied in society for goodwill. I don't think you need to address what happens in other sort of custodial or other settings. I don't think this case raises that question. This case falls squarely under the rule announced for society for goodwill, which has not been overruled by Deshaney. Thank you. Thank you. Judge Condon, do you have another question? I did, and it's just if you have the citation, counsel. You indicated that when he turned 18, he became a ward of the state, and so he initially, his mother is not the conservator of the person. So technically, his guardian, for that to happen, there had to be a finding that he was not competent to make decisions about his care. So typically, either he's turned over to sort of the custodial parent, if you will, although he's an adult now, there had to have been some kind of order. Do you know, if you know, if it's in the record? Yeah. It's not in the record, Judge, and my understanding of it is that he, I'm not aware of a hearing having taken place, but that is not in the record, and to the extent that is dispositive, we don't think that is dispositive at all in this case, but we would suggest that it be remanded for further development on that issue. Thank you. Thank you. Please proceed. May it please the Court, Doug Wagner on behalf of the Appellees, except for Appellee Ashley Sessions. This Court should affirm the judgment of the District Court because plaintiff could not state a substantive due process claim because CB's admission to Valley Ridge was voluntary. Starting with DeShaney. Well, once he got into the hospital, he was, I mean, he wasn't exactly incarcerated, and I'm talking about Valley Ridge, the secure facility, but his liberty and his movement and his ability to take care of himself, at least to access out of facility medical treatment, was thoroughly circumscribed. That's certainly true, Your Honor, but restrictive rules that an individual agrees to upon admission to these facilities cannot transform voluntary commitment to involuntary commitment. Did he have a right to basic, adequate health care in Valley Ridge? Not constitutionally, not constitutionally. He did under state law, under tort law, and other fonts of law, but as the U.S. Supreme Court said in DeShaney, the offering of care is not enough to create a constitutional duty upon state actors to provide that care. Go ahead. Go ahead. Ms. Jeff Harney. Are you sure? I would defer to you. Go ahead. Thank you. So, counsel, I have three questions, and then, because it's a little harder on Zoom, you agree with the premise, I think everyone agrees, that if he, if C.B. had been involuntarily sent to the facility, he would have due process rights, correct? Yes, and if I can just elaborate on what I agree on, I agree that if there were a court order confining him to this facility, then he would have a constitutional right under substance of due process to adequate care, yes. Okay. When is the nature or the status of the voluntariness of the custody determined? Is it when someone is admitted to a facility, or is it at the time of the alleged factual events that lead to the lawsuit? I have two answers, and first I would say, in terms of for C.B., he was determined competent to know that he was admitting himself to this facility, and that he would understand the rules of release, and I would direct your honor to MHL Mental Hygiene Law 15.15, which says... I'm glad you're directing me to that section, because that's if you, I think, anticipated my next question. There are many patients, whether it be individuals with developmental disabilities or mental health issues, that present to a hospital, a regular hospital, not a mental health facility per se, or they're in court, and somehow there's a question about their need for a mental health evaluation. They voluntarily sign themselves in, because they're deemed to be competent to do that. And then they're at the hospital a week, and they say, I'm done here, I'm fine, I can go home now. But they can't go home, right? So they make a request to go home, and the hospital, under the hygiene law, the facility has the right to hold the person for up to three days. So is a patient, let's forget CB for now, a patient who signs themselves in, is there a week, two weeks, six months, and says, I'm good, I want to go home, and files that letter, and is not allowed to leave. Is that person held in custody, or is that person still voluntarily there? So I think there are three buckets in Your Honor's question. The first bucket is individuals who are voluntarily committed, and then never request to leave. And that's what this case is. There's a second bucket, which is... You overlook the request to go to the hospital. Your Honor, the request to go to the hospital was not a written request to leave. It might be a closer case had they said, we are receiving inadequate medical care, and we demand to go to an outside hospital now, we don't have that here. We simply have a, would you please, my son's not feeling well. You've been complaining of his physical condition and asked to go to a hospital. You're saying that's not enough? That's not enough under the statute to render his care involuntary. The only thing that could render his care involuntary is if he gets to either the second or the third bucket. The third bucket is, the director has moved for involuntary commitment. That one, we think that would be involuntary. And then the middle bucket, which we don't fall into here, would be the holding period is ongoing. We think that's a very, that could be a difficult case. It's not a case that this court needs to decide. Why is it, why isn't it a difficult case? I have a hard time believing that the director of this medical facility, faced with a request by CB, let's say he didn't say, I want to go to the hospital. Let's say he said, I want to leave this facility. He can't read or write, but he can speak. I want to leave because I want to go home and see my mom because I'm sick, or I want to leave because I want to go to a hospital. He had said those words. I have a hard time believing that the director of this medical facility for a young adult of the age of 34 who had been institutionalized his, what appears to at least his adult, entire adult life, would have said, go ahead, walk out the door, and not have incurred the 72-hour hold. It would have been, one might argue, perhaps malpractice to do that or fall below the standard of care. So I don't understand how he doesn't fall into that category. He, at least for three days, would be in custody. So Your Honor, this is pure speculation because CB never made such a request, and certainly I agree with Your Honor that when written requests are made, individuals are not simply allowed to leave necessarily that day or immediately. The director would need to make a case-by-case analysis, and I see my time has expired, if I might continue to respond. So they need to make a case-by-case analysis, and for example, the agency might take into account do they have a placement elsewhere, do they think that they would like to be released and have no further treatment. But all of this is not in the record because that's just not the factual predicate here. The factual predicate here is that he was voluntary because he never issued a written request to leave. Well, let's say that J.M. had not pled in his state court tort theories. Is it your position that not having done that, he had no right, he had no, he wasn't entitled to adequate medical care under the due process? Yes, Your Honor, that's our position. That's what this Court said in Brooks, and it's also what this Court said in Brown against the City of New York. Well, Brown had to do with a homeless shelter where someone was free to come and go. That clearly wasn't the case here, and Brooks had to do with funding, generally funding entitlement. So really very different situations than were presented with here. So I disagree with Your Honor if I could take those in turn. So in Brown, there was an argument made that under society of goodwill, the custody was transformed into involuntary custody overnight because the facility had rules that between the hours of 10 and 6, you may not leave. And the panel there, citing Brooks, said restrictive rules do not transform custody into involuntary custody. Yes, but that was in the context still of an overnight retention, very different from here and in a summary order, a non-presidential summary order. So why don't you go on to Brooks? Sure. Let me go on to Brooks then. Brooks was about mental health facilities, and the funding issue is essentially a red herring. Here, the funding, the court said that the DeShaney holding was that the involuntary nature of custody was determinative. That is a quotation. Now, the funding had to do with whether or not there was an entitlement to the out-of-state placement that these parents wanted to continue. Certainly, let me explain it this way. If the state had involuntarily committed these individuals to their care, they could not cut funding because that funding would be what provided for the medical care, the food and the clothing. The state could have chosen not to provide anything. That's exactly right. Yeah. But we're in a different circumstance here where the state has chosen to run certain facilities that include both voluntary and involuntarily admitted individuals clearly in need of care based on all of the facts we've seen here. I'm having difficulty understanding exactly why the voluntarily admitted people are less entitled to a minimum standard of medical care than the involuntarily admitted because all of these people are incapacitated in some significant way. So, could you explain that difference? Yes. I don't really understand how you'd administer a facility that way. The critical difference is that those who are there under a court order have no ability to request release. If they submitted a written request for release, then this facility would say, we can't do that because the court has ordered you to stay. Whereas those who are there on a voluntary basis have a presumption that they will be entitled to leave unless the director decides that they need to petition a court for the court order and then hold them there. So, it's where the staff is structured about who is a voluntary admit and who is an involuntary admit? No, Your Honor. The individuals are treated all the same. But that doesn't... But that gets me... No, but suppose... Go ahead.  Go ahead. Oh, I'm sorry. That gets me to a follow-up question on this. I think Judge Carney's questions were... I have a follow-up as a result of that. And that is, one of the arguments you make in your brief is that even if we were to agree that this is, that Deshaney doesn't apply here, that your clients are entitled to qualified and so that they didn't, that it was not clear whether these people were, whether someone like CB, who had been initially admitted voluntarily, is now, they owe that person a duty of care. You just said all patients are treated the same because you have patients under court order and some that are there signed in voluntarily. So my question is, does the voluntariness of their admission change the standard of care for purposes of qualified immunity? In other words, is the staff saying, well, this person's here under a court order, so if they complain of chest pain, we better bring them to the hospital right away, versus somebody who complains of chest pain but is there voluntarily? The standard of care doesn't change. But what does change is whether or not these individuals have been deprived of their liberty against their will. As I answered previously, the individuals who are there voluntarily have the ability to withdraw their consent to be there and to leave, whereas those under court order do not. So suppose he didn't ask to leave, he said, I'm under serious distress, pain for this reason, that reason, another reason, and I need medical care. Would your client be entitled to say no because you're voluntary? Yes, Your Honor. They would be entitled to say no if they decided that they needed to move for a court order to commit pain. Would they be entitled to say, no, well, look, we're not going to give you any medical care. Here are two ads, we'll take them and go back, take them and let's lock him back up in his secure cell. Under the Constitution, he could not bring a substantive due process claim for adequate care in that scenario. Why? Why? Doesn't that strike you as a little bizarre? No, Your Honor. It does not strike me as bizarre because that is what the court expressly said in Descheny, because this individual had not, had his liberty restricted against his will. And going back to Brooks — What does that have to do with the level of medical care that he was entitled to? It has to do with whether the Constitution itself requires adequate care or whether the font of liability could come from state tort law or state regulatory law. Suppose he voluntarily committed himself to the institution. Once he got there, his health condition dramatically deteriorated and he was experiencing significant medical issues. Is it your position that your clients were still entitled to tell him, make due with the Advil because you came in here voluntarily? Yes, Your Honor. If — Oh, okay. Thank you. I see my time is up. We took a lot of — I'm sorry. I'll just make a few more points if possible, or I see there might be a question. We'll give you a little more time, I think. Okay. With my colleague's indulgence, if I may ask a follow-up question. And I defer to Judge Parker as presider. May I ask a question?  You may ask all the questions you want. Thank you. It's just one. It's by analogy. Often, and I'm using Connecticut as an example because I'm most familiar with the Connecticut criminal justice system. In Connecticut, someone's arrested by the police. A bail bondsman, not a judge, sets a bond. So if a homeless person is arrested for a misdemeanor, say a nonviolent misdemeanor, and a bondsman puts a surety bond of $500, which means the person can get out if they have $50, or if a friend shows up at the police station with $50, they're free to go. The only restriction is put up $50. Are you saying that that person is not in custody — is in prison voluntarily because they can walk out? No, Your Honor — If they just lost the money? No, Your Honor. That would be different than this case here. I take it the restrictions might be the restrictive rules that the appellant, the plaintiff, had agreed to, or perhaps his developmental disabilities. But as the First and Ninth Circuit have said, neither of those circumstances are state-imposed restraints upon individuals, whereas in your hypothetical, the state is imposing a restraint, i.e., you must pay us money or else you must remain in custody. The state is imposing the same restriction here, in fact, worse. Here, you have to give notice and then wait three days, up to three days presumably, for a subjective judgment by the medical director. How is that — that's actually worse. In my example of a bond, you can get out. There's no other restriction with cash. Here, even if he had filed the right paperwork, the director could have said, yeah, well, you know, I need to think about it. The difference is, Your Honor, that here, C.B. expressly agreed to the 72-hour holding period in the contract that he signed that asked for admission to this facility. And so he has agreed to this restriction upon his liberty. That's what keeps it voluntary as opposed to involuntary. And I know I'm way over time, but I could just make a quick point on qualified immunity. I think this discussion shows that DeShaney, Brooks, Brown, and all the out-of-circuit cases that have uniformly gone in our favor have unsettled whether or not society of poor goodwill remains. And these fact questions about how voluntary it could be, what were his disabilities exactly, his disabilities at the day that he might have requested release, there's no case that says the defendants were on notice that that type of fact-finding was necessary. We would be entitled to qualified immunity on both of those questions. If I may, so if we agree with you and the 1983 claim is dismissed, what options for relief are available to the plaintiff in state law? Are there 11th Amendment or other immunity questions about the defendants, or would the person be able to recover under state law for, let's say, it's established malpractice? The short answer is yes, the plaintiff would be able to recover under state law. In the record, there is a notice of a conditional dismissal of a court of claims action. So obviously there are 11th Amendment issues, you have to go to the court of claims. But the claimant has, or the claimant in that case, plaintiff here, has negligence and medical malpractice claims that are available to her or CB, the administrative CB of the state, and that case is conditionally dismissed and may be revived pending the determination on this case. So there's no bar to recovery, and I know we have some, I know that there's a circumstance under which the state can come and present a bill to the incarcerated, or to the person kept in custody for the amount of time there, presumably that could be offset against any recovery, is that right? I mean, obviously I'm not asking you to take a position. Yes, I take no position on this fact of this case, but yes, that could be pursuant to federal statutory regulations about, statutes and regulations about Medicaid. Oh, do you get attorney's fees under those state statutes? No, I haven't researched too thoroughly, but my general understanding is attorney's fees would be available in this action under 1988, but would not be available in the court of claims. I'm sorry, would be available under? In the court of claims, there are generally no attorney's fees allowed. So there would be attorney's fees in this action, but not in the state court action. Thank you very much. Thank you, Your Honors. Good morning. Good morning. May it please the court. My name is Benjamin Hill and I represent Appellee Ashley Sessions. Much of what I had prepared to discuss has already been discussed with the panel. I did just want to take a brief moment to reiterate the final point made by my co-counsel here, which is that the fact that we have several, not just our district court, but several district court judges that have applied to Cheney in this way, I think means that there's confusion over how it is to be applied, whether or not society for goodwill is still good law. And so for that reason, I do believe that qualified immunity should apply and that the court should apply it and remand with instructions to grant summary judgment on that basis. I suppose this person, JM, was under, it's obviously experiencing a significant medical issue. CP, the incarcerated, the individual, JM's the mother. I'm sorry. Yeah. The incarcerated, the hospitalized individual. Is it your position that administrators at the hospital or at the facility would be entitled to qualified immunity if they had just simply taken the position that we don't want to be bothered, we give him to Advil and send him back to his cell? Well, I think my response to that is, if you're asking whether or not there would be a constitutional violation initially, I think the answer is no for the reasons stated by counsel. And so I think qualified immunity would apply, but it would be moot because there wouldn't be any constitutional violation in the first instance. Other than that, I'm happy to rest on my papers unless anyone has any other questions. Thank you. Briefly, Your Honors. I think some of the argument from my adversary here reveals the illusory distinction between voluntary and involuntary residence in New York State mental health facilities. The notion that CB was there voluntarily, yet he requested to go to the hospital, but the request was not in written form and was therefore not sufficient to leave, just highlights the fact that his liberty was, in fact, truly restrained here. Let me interrupt, please. So my concern is that if we are to kind of abandon the voluntary and involuntary distinction as having been just dicta and to shamee and find a substantive process right in your client or in CB, that we risk, as Justice Scalia has written, creating a parallel constitutional tort system to the state system that ranges from, you know, anywhere from mild negligence to gross negligence and beyond. And that is really what constitutional law is about. I mean, the early substantive process cases talked about shocking the conscience and so on and looked at the nature of the relationship for the state and for a state's affirmative exercise of power and the kind of behavior to find a constitutional tort. So we might agree that there's a basic substantive process right to a minimum level of care, but how can you align my concerns that we be constitutionalizing a New York tort system in all of the state custodial facilities? Well, Judge, I think there are many contexts in which there lie analogous state tort laws that overlap with constitutional rights. In the excessive force context, for example, you might have a state tort claim in addition to an excessive force claim. State tort remedies are designed to compensate for a different and address a different kind of harm. The state torts are designed to compensate for injury. Section 1983, and this is acknowledged when we've discussed this in our brief, is designed to hold state actors accountable. Here we're talking about medical malpractice. I mean, failure to notice. I mean, people exercise judgment. They say that C.B. was on certain drugs that caused him to gain weight during this period, they thought. They didn't see the pitting edema. There were other conditions that this was a condition that developed over a period of four or five months. And so in their briefs they say, well, you know, it turned out that this was wrong. But, you know, even the bed checks were just remote bed checks to make sure someone was there. It sounds like a negligence, a malpractice case, and not a shock to conscience. It's a failure and a tragic failure. But why should you – are there any limits on the kind of substantive process claims that could be brought? Yes, Your Honor, and this was addressed in Youngberg. The standards are different. If we only are able to prove medical malpractice, we're not going to be able to sufficiently sustain our substantive due process claim because it requires us to prove more. There's a deliberate indifference standard under the substantive due process law. And it's a higher standard, and that makes sense. And that was announced in Youngberg. And we have to – and we have to show – So there was both deliberate indifference and a failure to exercise professional judgment within a substantive range. Correct. So that's what you would say is the standard here.  So it's different from the State tort law. It is. It's a different standard. It's a higher standard. We acknowledge that. We think we've met that here. The district court didn't address the merits of this at all. I'd be happy to run through the ways in which there was deliberate indifference here. But why do you believe your State remedies are inadequate? Because, Judge, one, like I said, I think Section 1983 carries a different purpose than State tort law. Number two, the compensation and the remedies are different. So, Judge Parker, you acknowledge the attorney's fees. But more fundamentally, in cases like this, in a death case, what is recoverable under State tort law is different from what is recoverable under Section 1983. One large difference, and it's been acknowledged in several district court cases, is the loss of enjoyment of life damages. Those are not available under State tort law. And so the kind of remedies that are available to J.M. because of her son being lost are different and are, frankly, fewer than they are under Federal constitutional law. But aren't those tied more directly usually to the sense that the State has abused its power? Whereas here the State is running a custodial facility with people who are there under different rubrics. But it's not quite the same kind of abusive power situation, right? I think this is an abusive power, Judge, because I think the State actors here had total control over his medical care. And what they did was just ignore the care that he needed. When he asked to go to the hospital. How is that different from him just having been admitted to a State hospital and getting less than the standard of care? Because, again, I think it goes back to the classification of this being a mental health institution. It's not a hospital. It's a mental health institution where he has no ability to go. At a hospital you can go and seek other care. You can go to a different hospital if you want to. You can de-admit yourself and go to a different hospital. C.B. didn't have that right. His entire medical, his entire health care was in the hands of the State. And they had total control of it. They had control of whether he went to a hospital. They had control of whether he got to see a nurse. That's not true when you're in a State hospital. And if I may just ask a question. Is part of the reason to allow this type of due process claim if, for example, and I know this is not the case here. I know there's some fact finding that perhaps the 3 a.m. and the 5.30 or the 6 a.m. check wasn't done at all because the staff member was watching a movie and was distracted and didn't check his room. But if this had been a case where somebody's in restraints. In this hospital someone on this particular floor is put in restraints overnight because they can't be trusted to get up in the middle of the night to use the facilities by themselves. So they are restrained. Would it be then that somebody who's there under a court order and restrained and the claim is that they were restrained too long without being checked. They could sue but somebody who is restrained but had come in voluntarily could not. Is that part of the concern that you're. That seems to be my adversary's position. And I think it is untenable in the way that the New York State mental health facilities are operated. If I could just make two very brief points. One in response to my adversary. Society for goodwill remains good law and controls this case. Qualified immunity should not be available in the face of a precedent that is on all fours with this case and has been in place for 40 years. Brooks did not in any way overrule society for goodwill. And in fact Brooks said specifically the reach of society for goodwill applies when the state's obligation to provide care is not in dispute. It said when the state's obligation to provide care is in dispute, that's when the reach of society for goodwill is controlled by DeShaney. Here the state's obligation to provide care is not in dispute and Brooks says that society for goodwill controls in that situation. And that's what we have here. And so QI should not be available. And one other thing I would just note, judges, is, and this is laid out very well I think in the amicus brief by Nilpi, but there's actually a state law that requires people who work with people with developmental disabilities to encourage them to apply for voluntary admission. The whole policy of New York State rests around trying to get people in these facilities to go into them voluntarily. And that is because the goal of these facilities is to get people out living independently on their own. A ruling that, in the way that my adversary is suggesting here, would undermine that entire system. We ask that the district court be reversed, in this case be remanded for further proceedings. Thank you. Thank you all. Thank you both. A very interesting case. Thank you to my colleagues. We will stand adjourned.